# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

═══════════════

## NO. 03-12-00165-CV

═══════════════


**Jessica Wischer, Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

═══════════════════════════════════════════════

**FROM THE COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY
NO. 01-595-FC1, HONORABLE SUZANNE BROOKS, JUDGE PRESIDING**

═══════════════════════════════════════════════


## M E M O R A N D U M   O P I N I O N


Following a jury trial, the trial court rendered judgment terminating Jessica Wischer's parental rights to her three children. The jury found that Wischer failed to comply with the provisions of a court order that specifically established the actions necessary for her to be reunited with her children following removal by the Texas Department of Family and Protective Services (the "Department") and that termination of her parental rights was in the children's best interests. *See* Tex. Fam. Code Ann. § 161.001(1)(O) & (2) (West Supp. 2011). In two issues on appeal, Wischer challenges the legal and factual sufficiency of the evidence to support the jury's best-interest findings. We will affirm.


### FACTUAL AND PROCEDURAL BACKGROUND

The Department first became involved with Wischer and her family in August 2008, after receiving a report of domestic violence between Wischer and Mychal Davis, the father of her

two youngest children.  At the time, Wischer had long-term, stable employment, a nice home purchased for her by her parents, and financial and child-care assistance from her parents.  However, she was largely caring for her children—eight-year-old J.S., two-year-old J.M.D.-1, and four-month-old J.M.D.-2—as a single parent because Davis had recently been imprisoned on a forgery conviction and J.S.'s father, Jacob Sandoval, was not involved in parenting.  During the initial investigation, Wischer reported to the Department that she was extremely stressed and anxious about her solo parenting responsibilities and that she had made at least two suicidal gestures in the recent past due to postpartum depression.  She denied the existence of domestic violence in the home but admitted that she and Davis would occasionally push and shove each other during arguments.  At some point, the Department also discovered that Wischer and Davis were habitual marijuana users, although Wischer denied any drug use in the children's presence or while she was pregnant.

In an effort to assist Wischer, the Department offered various services to her and kept tabs on the family via weekly home visits.  Davis was released from prison in October 2008 and returned to the home he shared with Wischer and the children.

In December 2008, Wischer voluntarily entered into a "Child Safety Evaluation and Plan" with the Department.  The terms of the safety plan were primarily directed to concerns about Davis.  Specifically, during a six-week period, Wischer was required to supervise all contact between Davis and the children, and Davis was required to submit to drug and alcohol assessments and random drug testing.  Contrary to the safety plan's requirements, however, Davis tested positive for marijuana use, and Wischer allowed Davis unsupervised contact with the children.  Although these facts are undisputed, the extent of the contact is in dispute.  Wischer admitted that she allowed Davis

2

to take the children to the doctor for immunizations while she was suffering from the flu, but she denied allowing him to drop the children off at day care on an occasion when she was not present. Nevertheless, based on the undisputed violations of the safety plan, the children were removed from Wischer's care in February 2009 and ultimately placed in their maternal grandparents' care. At that time, the court ordered Wischer, Sandoval, and Davis to comply with the terms of service plans provided by the Department and, among other things, expressly ordered all parties to refrain from illegal drug use and to submit to inpatient drug treatment upon testing positive for drug use.

During the months that followed, Wischer repeatedly tested positive for marijuana use and was ordered to enter drug-rehabilitation treatment in December 2009. While Wischer was in treatment, the children's grandparents allowed them to have a supervised visit with Wischer at the treatment facility, which apparently violated the terms of the Department's placement agreement with the grandparents. In addition, over the Christmas holidays, the children's grandfather took J.S. on an overnight trip out of state without first obtaining permission from the Department, which was alleged to be a further violation of the placement agreement. Due to these violations and the Department's impression that the grandparents favored J.S. over J.M.D.-1 and J.M.D.-2, the children were removed from their grandparents' care and placed with a foster family in January 2010.[1]

_____

[1] Elizabeth Byrd, the caseworker assigned to the case, also testified that it was difficult to work with the grandparents "in a collaborative way to meet the needs of the children," stating

> [The children's grandfather] was frequently very confrontational and almost attacking on the phone. He seemed to question every recommendation of the Department. . . . As I recall, [J.S.] was not in therapy[,] which was something that was asked of him. And they had—later on we found out that [the grandparents] had declined [early childhood intervention] services for [J.M.D.-2]. So just overall it didn't seem

Following Wischer's discharge from drug-rehabilitation treatment in December 2009, she tested positive for marijuana use on two occasions—once in December 2009 and once in January 2010, with two negative test results in between—but she remained clean thereafter and began to work her court-ordered service plan.[2] Based on Wischer's compliance with the service plan and positive improvements in areas of concern, the Department allowed the children to be returned gradually to Wischer's care under an "Order for Monitored Return of the Child," which expressly prohibited the children from having any contact with their biological fathers and their maternal grandparents. Pursuant to the monitored-return order, Wischer's eldest child, J.S., was returned to her care in August 2010, but before she could resume care of the younger children, the Department discovered that Davis was living in Wischer's home in violation of the court's order. Consequently, J.S. was again removed from Wischer's care in September 2010 and returned to the foster family that was also caring for his siblings.

In February 2011, the trial court named the Department the children's permanent managing conservator in a "Final Order in Suit Affecting Parent Child Relationship" ("final order"). The final order named Wischer possessory conservator and conditioned reunification with the children on a number of requirements, including completion of tasks outlined in a "Family Service

like the placement was willing to work with the Department to meet the needs of the children.

[2] The Department conceded that the December 2009 positive test result could have resulted from residual marijuana metabolites in her system. Wischer blamed the January 2010 positive test result on a "weight-loss cleanse" she was doing, which she contends caused stored marijuana metabolites to be released from her liver, resulting in a positive test result. The Department found Wischer's claim not to be credible, and there is no evidence in the record bearing on the scientific plausibility of Wischer's claim.

Plan" that was attached to the final order and incorporated by reference. Non-compliance with the terms of the final order is the basis of the Department's action to terminate Wischer's parental rights. Although the Department questioned the sincerity of Wischer's efforts to comply with the final order and found inconsistencies relating to her attendance at sobriety meetings, the Department concedes that Wischer substantially complied with the requirements in the final order except the requirement that she

> not associate, reside, or cohabitate with Jacob Sandoval, Mychal Davis, or any other person who has been arrested, charged or convicted of an offense involving illegal drugs, a felony offense, assaultive offense or harm to any child OR any person who has had their children removed from their care because of abuse or neglect.[3]

---

[3] The order also prohibited contact between the children and their biological fathers and maternal grandparents and imposed the following additional requirements on Wischer:

1. Attend and complete a protective parenting class;
2. Attend regular therapy sessions until successfully discharged by the therapist;
3. Submit to random drug tests;
4. Obtain and maintain regular and consistent employment;
5. Pay court-ordered child support;
6. Provide safe and stable housing;
7. Participate in therapy with the children and their therapists as requested by the therapists;
8. Abstain from the use of illegal substances and alcohol;
9. Take all medication properly as prescribed by physicians;
10. Attend all permanency and family group conferences requested by the caseworker;
12. Participate in an annual psychological examination with a psychologist designated by the caseworker; and
13. Abstain from any criminal activity and notify the caseworker within 48 hours of being arrested for any offense.

The court's order also required Wischer's compliance with and successful completion of the following tasks outlined in the family service plan:

5

There is neither allegation nor evidence that Wischer resided or cohabitated with any person in violation of the final order. However, it is undisputed that Wischer received at least three phone calls from Davis totaling up to twelve minutes of talk time over the course of several months in 2011.[4] She claimed to have taken Davis's calls only to discourage any further contact by him and

1. Sign and not revoke all necessary releases of information for the Department;
2. Provide proof of weekly attendance at a local support group for children who have been sexually abused and be able to articulate the impact of sexual abuse and demonstrate knowledge of the subject;
3. Complete a psychological evaluation and parent assessment with a designated psychologist and comply with all recommendations in the psychological evaluation;
4. Complete a psychiatric evaluation with a designated psychiatrist and comply with all recommendations of that evaluation including taking prescribed medications;
5. Submit to random drug testing;
6. Participate in weekly individual counseling sessions with designated therapist, take responsibility for negative choices, articulate what positive changes are being made in her life, and follow the therapist's recommendations;
7. Provide the Department with a written impact statement and statement showing an understanding of what each child needs emotionally and physically now and in the future;
8. Attend Alcoholics Anonymous, Narcotics Anonymous, or Marijuana Anonymous meetings twice per week, provide proof of attendance, and obtain a 12-step sponsor willing to provide information to the Department; and
9. Read four books recommended by J.M.D.-2's therapist regarding autism and Asperger's Syndrome and provide written reports to the Department demonstrating what she learned from the books.

Wischer was required to bear the costs of all services required under the family services plan and apparently did so.

[4] The record is less than clear regarding the number and duration of the calls. Wischer's phone records from September to December 2011 were introduced at trial, and four separate incoming calls totaling twenty-one minutes from three different telephone numbers are highlighted on those records. However, the evidence at trial links only three of the calls to Davis's cell or work phone numbers, which total up to twelve minutes in duration. On appeal, the Department cites only

she explained that she had not changed her cell phone number because (1) she had not been asked to do so and (2) it would not have prevented Davis from finding ways to contact her if he so desired. In addition, she admitted that an outgoing phone call of up to 1 minute was made from her cell phone to Davis, but she maintained that it was an accidental or inadvertent misdial and she only had Davis's phone number programed into her phone so she could identify and avoid his calls.

There was also some evidence of contact with Sandoval via his Facebook page. Specifically, in December 2011, Sandoval posted a query on his Facebook page—"Can anybody tell me where all the Ladys [sic] are . . ."—to which Wischer appears to have responded, "They Hidin From You!! [sic]." Wischer contends that a co-worker used her phone to post the comment as a prank on her, and she attempted to bolster her story with evidence of the co-worker's having used her phone on another occasion to post a comment to her own Facebook account. In addition, Wischer admitted that she pursued a romantic relationship with a man who had an "extensive" criminal history, but she asserted that she did not know he had a criminal history, the relationship lasted only a few months, and she had terminated contact upon learning of the man's criminal history. Finally, Wischer admitted to establishing a casual friendship with a woman who was involved in proceedings with the Department involving removal of her own children on child-endangerment grounds.

Two weeks before trial, the Department recommended that Wischer be reunified with her children, but based on the foregoing violations of the final order and consultation with J.S.'s

---

two calls totaling up to seven minutes, but Wischer's appellate brief refers to five phone calls totaling up to thirty minutes in duration.

therapist, the Department rescinded the recommendation and proceeded with its action to terminate Wischer's parental rights based on noncompliance with the final order. *See id.* The Department asserted that the violations of the final order went "to the heart" of the concerns about Wischer's parenting abilities.

After a four-day trial on the merits, a jury found that Wischer had not complied with the final order and that termination of her parental rights was in the children's best interests. *See id.* In accordance with the jury's verdict, the trial court rendered judgment terminating Wischer's parental rights to J.S., J.M.D.-1, and J.M.D.-2 and appointing the Department permanent managing conservator of the children.

On appeal, Wischer challenges only the factual and legal sufficiency of the evidence to support the best-interest finding.[5]

## DISCUSSION

A parent's rights to "the companionship, care, custody and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59 (1982). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

---

[5] Neither Davis nor Sandoval are parties to this appeal. Davis's parental rights to J.M.D.-1 and J.M.D.-2 were terminated after a bench trial in February 2011, at which he failed to appear. Sandoval voluntarily relinquished his parental rights to J.S. in January 2010.

8

Termination of parental rights is a drastic remedy in which the parent and child are permanently stripped of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West 2008). Due to the significance of the interests at issue and the gravity of the remedy sought in termination proceedings, we strictly scrutinize such proceedings in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20-21 (Tex. 1985).

To appropriately balance the interrelated and correlative interests affected in termination proceedings, the parent-child relationship cannot be terminated unless there is clear and convincing evidence that the parent committed one or more of the acts specifically set forth in family code section 161.001(1) and that termination is in each child's best interest. *See* Tex. Fam. Code Ann. §§ 161.001, .206(a) (West 2008). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2008). Due process demands this heightened standard because of the fundamental interests at issue. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002).

In this case, Wischer concedes that grounds for termination have been established by clear and convincing evidence based on her violations of the final order; therefore, only the jury's best-interest findings are at issue on appeal. Wischer contends that the evidence is legally and factually insufficient to support the best-interest findings, in part because (1) the violations of the final order were relatively minor compared to her substantial compliance with the extensive requirements in the final order and the family service plan and (2) the Department lacks a concrete plan for achieving permanency. She also asserts that evidence of the behavior that prompted the

9

Department's initial intervention should not be permitted to outweigh the positive improvements she has made to achieve reunification with her children.

When evidence-sufficiency grounds are asserted on appeal, we must apply a standard of review that reflects the clear-and-convincing burden of proof. *Id.* at 264-66. In reviewing the legal sufficiency of the evidence to support a termination finding, we look at all of the evidence in the light most favorable to the termination finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction about the truth of the matter on which the Department bears the burden of proof. *In re J.L.*, 163 S.W.3d 79, 84-85 (Tex. 2005); *In re J.F.C.*, 96 S.W.3d at 265-66. We do not, however, disregard undisputed evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. In reviewing the factual sufficiency of the evidence, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id*. We must consider the disputed evidence and determine whether a reasonable factfinder could have reasonably resolved that evidence in favor of the finding. *Id*. If the disputed evidence is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient. *Id*.

Several factors are pertinent to the best-interest inquiry, including (1) the child's desires, (2) the child's present and future physical and emotional needs, (3) the present and future emotional and physical danger to the child, (4) the parental abilities of the person seeking custody, (5) the programs available to assist these individuals in promoting the child's best interest, (6) plans for the child by these individuals or the agency seeking custody, (7) the stability of the home or proposed placement, (8) the parent's acts or omissions that may indicate that the existing

10

parent-child relationship is not appropriate, and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also* Tex. Fam. Code Ann. § 263.307 (West 2008) (stating that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and listing factors that court should consider "in determining whether the child's parents are willing and able to provide the child with a safe environment").[6] These factors are not exclusive, and no one factor is controlling. Moreover, the absence of some factors does not bar the factfinder from finding by clear-and-convincing evidence that termination is in a child's best interest. *C.H.*, 89 S.W.3d at 27. Indeed, it has been held that a single factor may be adequate in a particular factual situation to support a finding that termination is in a child's best interest. *In re J.O.C.*, 47 S.W.3d 108, 115 (Tex. App.—Waco 2001, no pet.),

---

[6] The factors identified in section 263.307 of the family code include: (1) a child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after an initial report and intervention; (5) whether the child is afraid to return home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm has been identified; (10) the willingness of the child's family to seek out, accept, and complete counseling and cooperate with supervising agencies; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child with adequate health and nutritional care, care and nurturance consistent with the child's development, guidance and supervision for the child's safety, a safe physical home environment, protection from exposure to violence even if not directed at the child, and an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. Tex. Fam. Code Ann. § 263.307(b) (West 2008).

*disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d at 267 n.39.  On the other hand, the presence of scant evidence relevant to each *Holley* factor will not support such a finding.  *C.H.*, 89 S.W.3d at 27.

With these guidelines in mind, we consider the evidence adduced at trial in light of the *Holley* factors.  Wischer contends that this case presents a tale of two mothers—one with a troubled past and one on the road to redemption.  One of the core disputes in this case is the extent to which a jury could have found that the sins of the past have roots in the present and pose a risk of physical and emotional danger to the children now and in the future.

When the Department first began working with Wischer nearly four years ago, she had a long history of daily marijuana use and was less than forthcoming with this information.  She was also in a relationship with Davis and exposed her children to him even though he was a habitual marijuana user with a criminal conviction for forgery.  Of significant concern to the Department and the children's therapists, there were incidents of domestic violence in the children's presence—Wischer conceded that Sandoval had once thrown a full beer can at her, prompting her to terminate her relationship with him; Wischer admitted to altercations with Davis involving shoving and pushing and also admitted to slapping him at least once; there is some evidence of daily fights between Wischer and Davis, possibly involving fists; and it is without dispute that Davis once threw a spoon into another room during an argument with Wischer and the spoon hit J.M.D.-1 in the stomach.  In addition, Wischer confided that she was stressed and anxious about her parenting responsibilities and was candid about attempting to strangle herself with a seat belt in front of her

12

mother and infant daughter on one occasion and threatening to do so on another. She also confessed to frustration and difficulty coping with J.M.D.-1's behavior issues.

Even after receiving services from the Department, Wischer struggled. She continued to abuse drugs and violated more than one safety plan designed to protect the children from exposure to individuals who were using drugs and had criminal backgrounds. She also sabotaged the Department's prior attempts at reunification by immediately allowing Davis to resume living with her in direct violation of a court order, and when the truth was discovered, she lied to the Department to cover it up.

In contrast to where she started, however, Wischer arguably had made significant strides in attaining positive improvements in her life in the two-year period preceding termination of her parental rights. She obtained and sustained sobriety for more than two years, up to and including the termination trial. She participated in all services required by the Department, including domestic violence and protective parenting courses, individual and family therapy, and sobriety programs. There was neither evidence nor allegation of domestic violence since the initial investigation by the Department. Moreover, Wischer testified that she had permanently severed her relationships with Davis and Sandoval and had recently terminated a romantic relationship because she had discovered that her boyfriend had an "extensive" (but unspecified) criminal history. It is undisputed—and was demonstrated at trial—that Wischer had educated herself about the challenges of raising her children, particularly J.M.D.-1, who has had developmental delays, and J.M.D.-2, who has been diagnosed with autism and oppositional defiant disorder.

In addition, Wischer sought treatment for her mental-health issues and is currently taking an antidepressant under a physician's supervision. With regard to Wischer's parenting abilities, the Department's permanency report to the court indicated that a psychologist evaluated Wischer in March 2011, about one year before the underlying trial, and determined that she "appear[ed] to be a potentially suitable independent parental resource." The report stated, however, that the psychologist further opined that Wischer needed "[i]ndividual therapy [that] focuses on self esteem and remotivation" and assistance "in studying the problematic nature of her previous relationships, and how to modify this dysfunctional pattern she demonstrates." No suicidal tendencies were noted.

At trial, the Department's witnesses were unable to identify any specific deficiencies in Wischer's parenting abilities other than the "dysfunctional pattern" evident in Wischer's personal relationships. However, the Department's primary source of concern for the children's well-being is the impact of Wischer's destructive relationships, and there is some evidence in the record that Wischer had not significantly improved in that regard. It is undisputed that Wischer had some contact with both Sandoval and Davis, because she had not taken adequate steps to ensure that her ties to them were severed—she remained "Facebook friends" with Sandoval and did not change her cell phone number so that Davis could not continue to contact her. Although the contact with Sandoval and Davis was limited, it violated the express terms of the final order. That contact, considered in light of her concurrent romantic involvement with an established criminal and friendship with a woman who lost custody of her own children on child-endangerment grounds, could indicate a fundamental failure to fully address the core issues that prompted the Department's

14

intervention in the first instance. According to the caseworker and two of the children's therapists, Wischer's failure to inquire about her most recent boyfriend's criminal history while pursuing a relationship with him reflected an inability to act as an appropriately protective parent. Both therapists were adamant that it would not be in a child's best interest to be placed with a parent who is unable to exercise good judgment in her personal relationships, especially when there has been a history of domestic violence and exposure to individuals engaging in criminal behavior that included chronic drug use.

The Department argued, and the jury apparently found, that Wischer's deviations from the requirements in the final order indicated that Wischer continued to retain her old behavior patterns and had not effectively "internalized" the changes necessary to be a protective parent to her children. A Department supervisor testified that the Department's basic concern was that

> [Wischer] seemed to be passively accepting [Davis's] contact with her. And not taking assertive action to stop it even knowing she was violating a court order and knowing that we had just received permanent managing conservatorship of the children. And . . . we were giving her a service plan with the opportunity to work toward getting [the children] back. And she was still violating the plan.

In other words, although Wischer's violations of the final order appear facially minor, her continued contact with persons of questionable character was consistent with her prior behavior, and the jury could reasonably have assigned greater significance to the violations based on her prior conduct. This is especially true in light of testimony from the Department caseworker, her supervisor, and the children's therapist's that termination of parental rights would be in the children's best interests because Wischer failed to internalize the cognitive and behavioral changes necessary to protect the

15

children from further exposure to domestic violence, drug abuse, and unsavory characters. While Wischer characterizes the past instances of domestic violence as "minor," the jury was free to view it differently. Moreover, a factfinder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent. *See In re D.L.N.*, 958 S.W.2d 934, 940-41 (Tex. App.—Waco 1997, pet. denied), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d at 267 n.39, and *In re C.H.*, 89 S.W.3d at 26; *see also May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi 1992, writ denied) (observing that past misconduct or neglect does not necessarily show present unfitness, but it is permissible to infer that "an adult person's future conduct may well be measured by his recent deliberate past conduct as it may be related to the same or a similar situation"); *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex. App.—Waco 1992, no writ) ("Past is often prologue.").

In addition to the technical violations of the final order, the jury heard evidence that Wischer failed to maintain contact with the children after she was told she could write them letters in May 2011. After being so advised, she sent letters to the children only two times—in September 2011 and November 2011. Wischer's caseworker testified that when she inquired about additional letters, Wischer replied that "she would get them to me or that she would try to write them or she was busy and sometimes she would not really respond." Her caseworker also testified that Wischer's communications with the Department rarely involved inquiries about the children and that she seemed to be most concerned about the impact the case was having on her. The caseworker related that

16

Ms. Wischer doesn't seem genuinely interested in her children. In my experience with her, she seems much more focused on the negative impact this case has had on her and doesn't seem to really take the extra step to focus on how her kids are doing or to take advantage of different opportunities that are provided to her to have contact with her children.

While Wischer's apparent diligence in complying with the majority of the requirements in the final order and service plan could suggest the contrary, the jury need not have disregarded the caseworker's opinion, which was based on her experiences and interactions with Wischer over an extended period of time.

On the positive side, there is considerable evidence that Wischer had maintained a level of long-term stability in a number of areas and had an adequate support system. She had been employed at CVS pharmacy for fourteen years, was able to provide a nice home in a decent neighborhood, and had parents who were willing to assist her both financially and in caring for the children. Notably, Wischer had abandoned her long-term drug use and maintained sobriety for more than two years. This is not an insignificant accomplishment, and we believe that the stability Wischer demonstrated in her rehabilitation from drug use renders the evidence of her past drug abuse of little probative value; however, we cannot say that it is so attenuated that the jury could not have given it any weight in considering the children's best interests.

Likewise, the jury could reasonably have disregarded Wischer's excuses or explanations for her contact with Sandoval, Davis, and her most recent boyfriend, especially in light of testimony from the Department caseworker and J.S.'s therapist that Wischer had a history of dishonesty. Moreover, Wischer provided no excuse or explanation for maintaining a friendship with a person who had lost custody of her own children for child endangerment except that "[i]t's nice

17

to be able to talk to somebody who had similar issues." The jury could reasonably have concluded that Wischer continued to exercise poor choices regarding her personal associations, which endangers her children's physical and emotional well-being now and in the future.

The evidence regarding the children's desires is equivocal. At the time of the trial, J.S. was eleven years old and suffered no apparent impediments to communicating his desires; J.M.D.-1 was five years old and had some speech delays that were being addressed through therapy; J.M.D.-2 was three years old and, in addition to being very young, has been diagnosed with autism and has significant deficiencies in verbal skills. Neither the children nor their foster parents testified, and no guardian ad litem was called to testify on their behalf. However, a Department caseworker and two of the children's therapists testified regarding the quality and extent of the relationships between the children and their foster parents.

The caseworker testified that (1) J.S. "tends to be a bit ambivalent [and said he'd] be fine with going home if his mom had cable television"; (2) J.M.D.-1 is "very bonded to her foster home" and she "seemed okay to be there [but] she [also] seemed okay to go home"; and (3) "it was very difficult to assess [J.M.D-2's] input" due to her age, but she seemed comfortable in the foster home and likes to sit in the foster mother's lap. She further testified to the progress the children have made in therapy and with their developmental deficiencies while in foster care. This testimony was echoed by the therapists for J.S. and J.M.D.-1.

J.M.D.-1's therapist further testified that she calls her foster mother "mom mom," identifies her foster mother as her mother, and has few memories of Wischer. J.S.'s therapist testified that J.S. had "processed through" his relationship with his mother and has "moved on." She

also related that J.S. felt reunification would ultimately fail. In the therapist's opinion, J.S. feared that his mother would continue to give the Department justification for removing the children from her care.

Despite the children's apparent contentment in the foster home and the younger children's bond to their foster family, the evidence established that the foster placement would be temporary. Indeed, it was expected that at least one of the children—and perhaps all of them—would be removed from the foster family in the near future due to licensing limitations on the number of paid foster children permitted to be in the family's home. In addition, the foster parents were not willing to adopt the children. Nevertheless, there was no evidence of any appreciable bond between the children and their mother, who had not seen them in over eighteen months,[7] and no evidence of their desire to return to her other than indifference. In general, the evidence showed that the children are happy in the foster home, but that the placement was likely to be an impermanent situation.

The impermanency of the Department's plans for placement is one of the central issues Wischer raises concerning the jury's best-interest findings. Department witnesses—including J.S.'s therapist and J.M.D.-1's therapist—testified that the children desperately need stability in their lives, and there were also several witnesses who testified that adoption provides the best option for achieving permanency given the prior removals from Wischer's care and indications that she has not processed the changes necessary to avoid future removals. Although no adoptive family had been

---

[7] There is no indication that Wischer was permitted visitation but failed to take advantage of it; however, there is evidence that Wischer was allowed to maintain contact with the children via letters and did so only minimally.

identified and there is admittedly no guarantee that the children would ever be adopted, the caseworker's supervisor testified that the children are "very adoptable" as "a sibling group." The supervisor further testified that the Department had examined all options for relative placement, but were unable to find a relative willing or able to care for the children; however, once the children are placed in an adoption unit, additional resources would be available to help identify kinship placements.[8] The Department caseworker, her supervisor, and J.S.'s therapist all testified that termination of Wischer's parental rights is essential to achieving permanence and stability in the children's lives. Indeed, the supervisor strongly favored adoption over reunification to the point of stating that it would be better for the children to be split up than to be reunited with their mother.

There was some evidence that monitored return is an alternative to termination of parental rights that could achieve permanency on a more certain time-frame. Both J.M.D.-1's therapist and the caseworker testified that monitored reunification could provide for a permanent placement within three to twelve months but only if reunification with Wischer was otherwise in the children's best interests. In that regard, there is evidence that (1) Wischer had a history of dishonesty that made it difficult to adequately evaluate her parenting capabilities and the likelihood of successful reunification, (2) the children had already been repeatedly unsettled over a nearly four-year period, and (3) Wischer lacked the ability to internalize the cognitive and emotional changes necessary to ensure the children's long-term stability in her care. The caseworker's supervisor testified:

---

[8] Wischer's father testified that he and his wife would take the children "in a heartbeat." Apparently based on the children's prior placement with their maternal grandparents, the Department did not appear to consider this a viable option for adoption.

> The pattern [of behavior Wischer] has exhibited during the past three-and-a-half years and learning about this new relationship [with a man with an extensive criminal record] and the risk [to the children and] how that speaks to the pattern that has already been exhibited. . . . I know the children need permanency, and I do believe that it is in their best interest that her rights be terminated so they can achieve permanency and be in a safe home.

. . . .

> We absolutely do not want to place these children at risk. They have been through way too much. It would be extremely detrimental to their well-being, as everyone has testified, for there to be continued changes where there would be a risk of harm and they would have to be removed.

And, as alluded to in the foregoing excerpt, other witnesses testified similarly.

There is a strong presumption that a child's best interest will be served by preserving the parent-child relationship, *see In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam), and parental rights may not be terminated merely because a child might be better off living elsewhere. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). Nevertheless, a factfinder can consider that a child's best interest may be served by termination of parental rights so that adoption may occur rather than the impermanent foster-care arrangement that would result if termination were not ordered. *D.O. v. Texas Dep't. of Human Servs.*, 851 S.W.2d 351, 358 (Tex. App.—Austin 1993, no writ), *disapproved of on other grounds by In re J.F.C.*, 96 S.W.3d at 267 n.39. In considering a child's present and future emotional and physical needs, the need for permanence is of paramount importance, and in the end, if there are competing interests, a parent's interests must yield to the child's best interest. *See Dupree v. Texas Dep't of Protective & Reg. Servs.*, 907 S.W.2d 81, 86-87 (Tex. App.—Dallas 1995, no writ).

On the whole, the evidence regarding the best course of action for the children was conflicting, but it was within the jury's province to give more credit to the Department's plans for adoption over reunification with Wischer. *See In re B.S.W.*, No. 14-04-00496-CV, 2004 WL 2964015, at *9 (Tex. App.—Houston [14th Dist.] Dec. 23, 2004, no pet.) (mem. op.) (parent's failure to show stability to parent "for any prolonged period" entitled factfinder "to determine that this pattern would likely continue and that permanency could only be achieved through termination and adoption").

Considering the evidence in light of the *Holley* factors, this is a close case. However, giving full consideration to the disputed and undisputed evidence and inferences, we hold that the record contains sufficient evidence for a reasonable fact-finder to form a firm conviction or belief that termination of Wischer's parental rights is in the children's best interests. Based on the evidence, the jury could properly conclude by clear and convincing evidence that: (1) Wischer's conduct in the past endangered the children's physical and emotional well-being and may recur in the future if the children are returned to her; (2) Wischer lacks the ability to provide adequate care by showing poor judgment currently and in the past; (3) Wischer may be unable to meet the physical and emotional needs of the children now or in the future, especially considering the children's special needs; and (4) Wischer will be unable to provide the children with permanency or stability given the outcome of prior opportunities for reunification and repeated patterns indicating poor judgment. This is not a situation in which irrelevant past acts are given undue weight; it is a situation in which there is sufficient clear and convincing evidence that present conduct—despite

22

years of services and knowledge that reunification was at stake—creates a genuine risk that past endangering conduct would be likely to continue into the future.

Although the record shows considerable positive improvements Wischer has made in the past two years and significant compliance with the final order, the jury could have determined that Wischer had not sufficiently improved in terms of her ability to be an appropriately protective parent, which includes providing a safe home environment, protection from exposure to violence, and stability. On appeal, we may not substitute our judgment based on our review of the written record in place of the findings of a jury that heard live testimony and found by clear and convincing evidence that Wischer's parental rights should be terminated. We overrule Wischer's appellate issues.

**CONCLUSION**

For the reasons stated, we affirm the trial court's judgment terminating Wischer's parental rights to J.S., J.M.D.-1, and J.M.D.-2.

_____

J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Rose and Goodwin

Affirmed

Filed: August 29, 2012

23